Filed 10/20/17; Certified for Publication 11/2/17 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TROY FLOWERS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,<br><br>    Defendant and Respondent. | D071392<br><br><br><br>(Super. Ct. No. 37-2015-00029957-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge. Affirmed.

McColloch Law Firm, Maria E. Saling and Michael T. McColloch for Plaintiff and Appellant.

Gibson, Dunn & Crutcher and Ethan D. Dettmer for Defendant and Respondent.

In the period between 2000 and 2001, plaintiff and appellant Troy Flowers's application for a securities sales license was rejected by Ohio state officials because they found that he was "not of 'good business repute.' " In addition, Flowers was subjected to discipline by securities regulators with respect to his violation of securities laws and

regulations and his failure to cooperate in a securities investigation. A publicly accessible record of this disciplinary history is maintained by defendant and respondent, the Financial Industry Regulatory Authority, Inc. (FINRA).

Flowers filed a complaint against FINRA in which he sought an order requiring that FINRA expunge his disciplinary history from its records. The trial court sustained without leave to amend FINRA's demurrer to Flowers's complaint. Because federal securities laws and regulations provide Flowers with a process by which he may challenge FINRA's publication of his disciplinary history, and Flowers has not pursued that process, he may not now, by way of a civil action, seek that relief from the trial court. Accordingly, we affirm the trial court's order sustaining the demurrer and its judgment in favor of FINRA.

FACTUAL AND PROCEDURAL BACKGROUND

Although FINRA is a private, not-for-profit Delaware corporation, it is also a self-regulatory organization (SRO) authorized under title 15 United States Code section 78*o*-3 et seq. (The Maloney Act, amending the Securities Exchange Act of 1934 (the Exchange Act)); as such, it is registered with the federal Securities and Exchange Commission (SEC) as a national securities association. Prior to 2007, FINRA was known as the National Association of Securities Dealers (the NASD); in 2007, the NASD consolidated its regulatory functions with the regulatory functions NYSE Regulation, Inc. provided for the New York Stock Exchange and changed its name to FINRA. (See *In re Series 7 Broker Qualification Exam Scoring Litigation* (D.D.C. 2007) 510 F.Supp.2d 35, 36, fn.1, aff'd (D.C. Cir. 2008) 548 F.3d 110.)

In its role as an SRO, FINRA is subject to extensive oversight by the SEC. (See 15 U.S.C. § 78s; *First Jersey Securities, Inc. v. Bergen* (3d Cir. 1979) 605 F.2d 690, 693, cert. denied, 444 U.S. 1074.) FINRA disciplines its members when it has determined they have violated securities laws and regulations or FINRA's own rules. (15 U.S.C. § 78s.) The Exchange Act itself requires that, as an SRO, FINRA maintain information in a central registration depository (CRD) database about its member firms as well as their current and former registered representatives, including their broker representatives. (See 15 U.S.C. § 78*o*-3(i)(1)(A); *Santos-Buch v. Fin. Indus. Regulatory Auth.* (S.D.N.Y. 2014) 32 F.Supp.3d 475, 479.) Of concern here, the Exchange Act further requires that FINRA *publish* information about its members' "disciplinary actions, regulatory . . . proceedings, and other information required by . . . exchange or association rule, and the source and status of such information." (15 U.S.C. § 78*o*-3(i)(5).) FINRA does this through BrokerCheck (https://brokercheck.finra.org), which allows members of the public to search for and review the professional history of individual brokers.

BrokerCheck was established when in 2009, with the SEC's approval, FINRA adopted Rule 8312 of its rules. In approving FINRA Rule 8312, the SEC stated: "BrokerCheck allows the public to obtain certain limited information regarding formerly associated persons, *regardless of the time elapsed since they were associated with a member, if they were the subject of any final regulatory action.*" (75 Fed.Reg. 41254 (July 15, 2010) (italics added).) The SEC noted that former brokers, "although no longer in the securities industry in a registered capacity, may work in other investment-related

industries, such as financial planning, or may seek to attain other positions of trust with potential investors." (*Id*. at p. 41257.) Thus, on one hand, the SEC found that "[d]isclosure of such person's record while he was in the securities industry via BrokerCheck should help members of the public decide whether to rely on his advice or expertise or do business with him"; on the other hand, it also found that the absence of this information "could lead a person making an inquiry about a formerly associated person to conclude that the formerly associated person had a clean record." (*Ibid*.) The SEC noted that, "if registered persons are aware . . . information will be available for a longer period of time, it should provide an additional incentive to act consistent with industry best practices." (*Ibid*.) In describing and approving FINRA'S creation and operation of BrokerCheck, the SEC stated: "FINRA has a statutory obligation to make information available to the public and, . . . the [SEC] believes that FINRA should continuously strive to improve BrokerCheck because it is a valuable tool for the public in deciding whether to work with an industry member." (Securities and Exchange Com., Release No. 34-61002, (Nov. 13, 2009), 74 Fed.Reg. 61193, 61196 (Nov. 23, 2009).)

Flowers was a registered representative of two NASD member firms from 1995 until 2000, Pacific Cortez Securities Incorporated (also known as La Jolla Capital), and Equitrade Securities Corporation. As such, his regulatory history as a participant in the securities industry is available to the public on BrokerCheck. There is no dispute Flowers's BrokerCheck history states that: in August 2000, the Ohio Division of Securities rejected his application for a securities salesperson license because it found that he was "not of 'good business repute' "; that in 2000, he was fined $10,000 by the

4

NASD for engaging with La Jolla Capital in penny stock sales, which did not comply with the Exchange Act and SEC Penny Stock Rules; and that in 2001, the NASD barred Flowers from participating in the securities industry because he failed to timely cooperate with an NASD investigation as required by his firm's membership in the NASD.

By way of the complaint he filed in the trial court against FINRA, Flowers sought an order requiring that FINRA expunge these matters from its database. Flowers alleged that the information about him as disclosed on BrokerCheck was false, inaccurate and misleading. In particular, he alleged that he had never in fact applied for an Ohio sales license, that in 2000, he had accepted the $10,000 fine only because he was leaving the securities business and did not wish to contest the matter, and that he initially had declined to cooperate with NASD's investigation on the advice of counsel and had later agreed to cooperate. Flowers further alleged that although he no longer wishes to act as a securities broker, his BrokerCheck record prevents him from opening a personal securities account and, because it is publicly available, the record inhibits his ability to obtain employment. Given these circumstances, Flowers's complaint alleges that as a matter of equity the three items should be expunged from FINRA's records.

Initially, FINRA removed Flowers's complaint to the United States District Court. However, the district court remanded the case to the trial court, where FINRA filed a demurrer. In support of its demurrer, FINRA asked the trial court to take judicial notice of records with respect to Flowers's Ohio application for a sales license and its own

5

records of the regulatory actions it took against Flowers.[1]  FINRA argued Flowers's complaint was barred by the requirement that he exhaust available administrative and judicial remedies and that in any event his claims were preempted by federal securities laws and regulations.  The trial court agreed and sustained FINRA's demurrer without leave to amend and entered a judgment in favor of FINRA.  Flowers filed a timely notice of appeal.

## I

The principles governing our review of orders sustaining a demurrer without leave to amend are well-established.  " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' "  (*Champion v. County of San Diego* (1996) 47 Cal.App.4th 972, 976, quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

---

[1]     Those documents conflict with Flowers's allegations with respect to the accuracy of FINRA's BrokerCheck disclosures.

6

II

We agree with the trial court that Flowers's complaint is barred by the doctrine of exhaustion of remedies. As we explain, our concern here is not so much with the fact that it appears from the record that Flowers could have challenged Ohio's rejection of his sales license, as well as NASD's earlier disciplinary actions administratively and obtained judicial review of any adverse administrative determination[2]; rather we are more concerned here with Flowers's ability to seek relief from *publication* of those matters first from FINRA itself, then the SEC and finally a United States Circuit Court of Appeals. With respect to disciplinary actions against participants in the securities industry, we believe the doctrine of exhaustion of remedies requires that such a determination be made in the first instance in the forums to which Congress has assigned the task of resolving those issues. Moreover, by requiring that the subject of a BrokerCheck report which includes disciplinary action seek expungement by way of exhausting the remedial scheme available under the Exchange Act, we not only assure that the expertise and interests of the institutions to which Congress has delegated the task of policing the securities industry is brought to bear, we also diminish the risk of intruding into areas where state law has been preempted by federal securities statutes and regulations.

"[W]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act."

---

[2] The record includes documents which demonstrate that Flowers received notice of his right to challenge both the rejection of his application for an Ohio sales license and the discipline imposed by NASD.

7

(*Abelleira v. Dist. Ct. of App.* (1941) 17 Cal.2d 280, 292.) Exhaustion of available administrative remedies "is a jurisdictional prerequisite, not a matter of judicial discretion." (*Yamaha Motor Corp. v. Super. Ct.* (1986) 185 Cal.App.3d 1232, 1240, citing *Wilkinson v. Norcal Mut. Ins. Co.* (1979) 98 Cal.App.3d 307, 313.) "[E]ven though the administrative remedy is couched in permissive language[,] an aggrieved party is not required to file a grievance or protest if he does not wish to do so, but if he does wish to seek relief, he must first pursue an available administrative remedy before he may resort to the judicial process." (*Yamaha Motor Corp. v. Super. Ct.,* at p. 1240, citing *Morton v. Super. Ct.* (1970) 9 Cal.App.3d 977, 982.)

"There are several reasons for the exhaustion of remedies doctrine. 'The basic purpose for the exhaustion doctrine is to lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief.' [Citation.] Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor 'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.' [Citation.] It can serve as a preliminary administrative sifting process [citation], unearthing the relevant evidence and providing a record which the court may review. [Citation.]" (*Yamaha Motor Corp. v. Super. Ct., supra*, 185 Cal.App.3d at p. 1240.)

The doctrine of exhaustion of remedies is not solely a creature of our state law, but has been repeatedly recognized by federal courts in their disposition of closely related securities cases involving discipline imposed by SROs. (See, e.g., *Barbara v. NYSE*

8

(1996) 99 F.3d 49, 56–57 (*Barbara*).) "The exhaustion requirement has also been applied to review of disciplinary actions by self-regulatory organizations such as national securities exchanges. [Citations.] . . . [G]iven the 'comprehensive review procedure' established by the Exchange Act [citation] Congress intended that the doctrine of exhaustion of administrative remedies, in appropriate circumstances, apply to challenges to the disciplinary proceedings of the national securities exchanges." (*Id*. at p. 57.)

Here, FINRA has emphasized that its publication of Flowers's regulatory history was an important part of its enforcement responsibility. As the court in *Barbara* noted, Congress has provided for administrative review by the SEC of FINRA's enforcement of its rules and resort to the circuit court of appeals. (*Barbara, supra*, 99 F.3d at pp. 56–57.) Thus, if Flowers was unable to obtain relief from the publication of his history from FINRA itself, he could have asked for relief from the SEC and in turn a federal circuit court. (*Ibid*.)

In requiring that Flowers exhaust his federal administrative and judicial remedies, we fully recognize the trial court has equitable power to order expungement of public records in appropriate circumstances. (*Lickiss v. Financial Industry Regulatory Authority* (2012) 208 Cal.App.4th 1125, 1133–1134 (*Lickiss*).) The court in *Lickiss* expressly recognized that power. (*Ibid.*) "[I]n any given context in which the court is prevailed upon to exercise its equitable powers, it should weigh the competing equities bearing on the issue at hand and then grant or deny relief based on the overall balance of these equities . . . [thus,] expungement is proper where the benefits to the petitioner *outweigh the disadvantages to the public and the burden on the court*." (*Ibid*.; italics added.)

9

However, because a trial court, in exercising its equitable power to order expungement, must weigh the benefits to an individual against the public's interest in full disclosure, disposition of Flowers's claims by the agencies tasked with protecting the public interest will not only avoid the need for the trial court's intervention but will plainly facilitate the " 'development of a complete record that draws on administrative expertise.' " (*Yamaha Motor Corp. v. Super. Ct., supra*, 185 Cal.App.3d at p. 1240.)

As we noted, a closely related concern is preemption. We accept the holdings of federal cases which have found that FINRA's publication of disciplinary histories is not protected by the "complete preemption," which would prevent application of any state, statute, or rule of law. (See *Godfrey v. Fin. Indus. Regulatory Auth.* (C.D.Cal., Aug. 9, 2016, No. CV 16-2776 PSG) 2016 WL 4224956; *Doe v. Fin. Indus. Regulatory Auth.,* (C.D.Cal., Nov. 19, 2013, No. CV 13-06436 DDP) 2013 WL 6092790.) Finding an absence of complete preemption, those cases permit state as well as federal jurisdiction over FINRA publication and expungement issues. However, here we are concerned with the narrower doctrine of "conflict preemption," which arises by implication when "Congress's intent to preempt state law is implied to the extent that federal law actually conflicts with any state law. [Citation.] Conflict preemption analysis examines the federal statute as a whole to determine whether a party's compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives." (*Whistler Invs. v. Depository Trust & Clearing Corp.* (2008) 539 F.3d 1159, 1164.) Conflict preemption applies even where, as here, a case is heard in a state

10

tribunal.  (See, e.g., *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 352, [preventing state court from applying rule which is obstacle to purposes and objectives of Federal Arbitration Act].)  In light of the SEC's determination the public has an interest in having access to the disciplinary records of individuals providing financial and investment advice, there is an obvious risk of conflict between the SEC's conclusion a particular individual's records should remain public and a state court's decision that the individual's interests outweigh the public benefit of disclosure.  Such a result would plainly put FINRA in a situation where it was subject to the conflicting duties and in turn require application of conflict preemption.

Contrary to Flowers's argument, the holding in *Lickiss* has no bearing on the exhaustion of remedies determination we make here.  In *Lickiss,* the court held the provisions of FINRA's distinct rule 2080 only govern the circumstances under which FINRA will waive its right to participate in *third party* judicial or arbitral proceedings involving customer disputes and in which expungement has been sought by a FINRA member; contrary to FINRA's contention in *Lickiss*, the waiver of notice and service standards set forth in rule 2080 do not govern the substantive principles of equity, which a court must apply in determining whether such expungement is appropriate.  (*Lickiss, supra*, 208 Cal.App.4th at pp. 1135–1136.)

We note that in adopting the predecessor to rule 2080 discussed in *Lickiss*, the NASD was responding to concerns that members, by way of settlements with customers in third party litigation would be able to "buy clean records" by obtaining an expungement order from a court or arbitrator hearing a customer complaint. (68 Fed.Reg. 74667-01.) Rule 2080 and its predecessor sought to prevent such evasion of its recording keeping and publication responsibilities by requiring notice to the NASD and now FINRA and providing them an opportunity to object to any expungement sought in such third-party proceedings. In the context of third party customer disputes which are the subject of rule 2080, the SEC has expressly found state and federal courts are fully capable of determining whether expungement is appropriate. (68 Fed.Reg. 74667-01; *Lickiss, supra*, 208 Cal.App.4th at p. 1135.) As FINRA emphasizes, Flowers is seeking expungement of disciplinary actions FINRA itself has taken against him and quasi-disciplinary action taken by the State of Ohio; by its terms rule 2080 does not speak to expungement of such disciplinary actions. Thus, the SEC's expressed willingness to permit the state and federal courts where customer complaints are pending determine whether expungement is appropriate in those cases in no way suggests the SEC believes *its* own disciplinary actions should be treated similarly by courts or any other forum which did not impose the discipline in the first instance.

In sum, we affirm the trial court's judgment because although the trial court has equitable power to order expungement of public records, in this case Flowers has an adequate and more carefully tailored remedy under the process set forth in the Exchange Act.

12

DISPOSITION

The judgment is affirmed.  FINRA to recover its costs of appeal.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


NARES, J.

13

Filed 11/2/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TROY FLOWERS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,<br><br>    Defendant and Respondent. | D071392<br><br>(Super. Ct. No. 37-2015-00029957-CU-MC-CTL)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed October 20, 2017, was not certified for publication. It appearing the opinion meets the standards specified in California Rules of Court, rule 8.1105(c), the respondent's request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein to be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties